## Commonwealth *vs.* Robert Smith.

Norfolk.  March 7, 1988. — December 12, 1988.

Present: Hennessey, C.J., Liacos, Abrams, Nolan, & O'Connor, JJ.

*Jury and Jurors. Practice, Criminal,* Jury and jurors, Deliberation of jury, Nonparticipating alternate juror, Impeachment by prior conviction, Judicial discretion. *Evidence,* Prior conviction, Judicial discretion, Redirect examination. *Witness,* Impeachment, Redirect examination.

This court concluded that, in view of the vital importance of a criminal defendant's right to trial by a jury that is free from outside influence, and the potential for interference with that right, a defendant was not barred from contending on appeal that the presence of alternate jurors in the jury room during deliberations, which is proscribed by Mass. R. Crim. P. 20 (d) (2), 378 Mass. 889 (1979), was error requiring reversal of his convictions even though defendant's trial counsel had agreed to that procedure. [492-495] Abrams, J., concurring; Nolan, J., dissenting.

On appeal of criminal convictions following a jury trial in which the prosecutor and defendant's trial counsel had agreed that the four alternate jurors remaining after reduction of the jury to twelve members pursuant to Mass. R. Crim. P. (20) (d) (2), 378 Mass. 889 (1979), would be permitted to attend, but not participate in, the jury's deliberations, and the judge, with concurrence of defense counsel, had instructed the jury concerning nonparticipation by the alternates, this court declined to remand the case for an evidentiary hearing to determine whether the defendant had been prejudiced by the improper procedure and, instead, reversed the defendant's convictions and remanded the case for a new trial. [495-497] Abrams, J., concurring; Nolan, J., dissenting.

At the trial of indictments charging armed assault in a dwelling with intent to commit a felony and assault and battery by means of a dangerous weapon, the judge properly exercised his discretion in allowing the prosecutor to impeach the defendant with evidence of prior criminal convictions similar to the crimes for which he was being tried. [497-498]

At a criminal trial the judge properly allowed a prosecution witness to testify on redirect examination that the defendant had given blood, saliva, hair and handwriting samples under court order and not "voluntarily," to rebut defense counsel's apparent attempt on cross-examination to lead the jury to draw an inference of innocence from the manner and circumstances of the defendant's giving the samples. [498-499]

INDICTMENTS found and returned in the Superior Court Department on January 21, 1985.

The cases were tried before *Paul K. Connolly,* J.

The Supreme Judicial Court granted a request for direct appellate review.

*Maureen B. Brodoff,* Committee for Public Counsel Services, for the defendant.

*Paul J. Molloy,* Special Assistant Attorney General, for the Commonwealth.

O'CONNOR, J.   The defendant was convicted of one count of armed assault in a dwelling with intent to commit a felony, and two counts of assault and battery by means of a dangerous weapon. He appealed, and we granted his application for direct appellate review. On appeal, he alleges three grounds of reversible error: first, that the trial judge improperly allowed four alternate jurors to attend the jury deliberations; second, that the defendant was deterred from testifying in his own behalf because the trial judge committed an error of law in denying the defendant's motion in limine to bar use of the defendant's prior armed robbery convictions for impeachment purposes; and third, that the trial judge wrongly allowed the prosecutor to elicit the fact that the defendant had been compelled to give saliva, blood, hair, and handwriting samples by means of a court order. We agree with the defendant that it was reversible error to allow the four alternate jurors to be present in the jury room during jury deliberations, and we therefore reverse his convictions. For the guidance of the parties and the judge on remand, we shall briefly comment on the other issues.

The prosecution's evidence indicated that two armed, masked men invaded the home of Roland Backlund and his son, Michael, in Braintree at about 9 P.M. on the night of October 30, 1984. The intruders assaulted the Backlunds and demanded the key to a safe in the Backlund home. The police were alerted by a neighbor, and Officers Kessinger and Brady arrived at the scene at about 9:20 P.M. Shots were exchanged, and the heavier of the two intruders was hit by a bullet. The intruders escaped.

An intensive search of the area around the house was under-taken. At approximately 10:45 P.M., a man was found wounded, muddy, and soaking wet under a dock at the Braintree Yacht Club, not far from the victims' house. Their house bordered on the Monatiquot River. The defendant and the prosecution agree that this man, Richard Molisse, was one of the Backlunds' assailants.

At 1:30 A.M., Braintree police Officer Leo Coppens noticed the defendant hop over a guardrail onto Quincy Avenue near the Thayer Public Library, an area roughly adjacent to the Braintree Yacht Club. He was wearing dark clothing, and was soaking wet and covered with mud. The man matched a descrip-tion of the second assailant given to Officer Coppens by Officer Brady, and Coppens proceeded to arrest the defendant. After the arrest, Brady positively identified the defendant, saying "I can tell by the eyebrows," a reference to the defendant's very full, bushy eyebrows. Brady also identified the defendant in court as the second assailant.

At trial, the defendant attempted to cast doubt on whether he was the second assailant. In his closing argument, defense counsel also argued that there had not been any second assail-ant, and that Molisse had perpetrated the crime by himself.

Sixteen jurors had been empaneled. The prosecutor and de-fense counsel agreed that the four alternate jurors remaining after reduction of the jury to twelve members pursuant to Mass. R. Crim. P. 20 (d) (2), 378 Mass. 889 (1979), would be permitted to attend, but not participate in, the jury's delibera-tions. Nothing in the record or in the parties' briefs suggests that the defendant personally agreed to that procedure. At the conclusion of his jury instructions, the judge explained to the jurors the process of jury reduction and the role of the alternate jurors in this way: "At the start of this case, we impanelled sixteen jurors as insurance against the contingency that some of you might not be able to continue serving after the case was started, and this would be in order to avoid a mistrial. However, fortunately we're all here and everyone seems to be in good health. Ordinarily, we handle this by having the clerk draw from the box the names of the four jurors, and those are called

the alternate jurors, and they stand by ready to serve in the event one of the working jurors is for any reason unable to continue.

"Counsel, in appreciation of what good jurors you have been, have agreed that those four jurors that are chosen as alternate jurors will be permitted to go into the jury room and listen to the discussions but will not be permitted to say anything, nor will they of course be permitted to vote.

"This is a more — it seems like a fairer method than having those four jurors sit outside the jury room just waiting for the jury to come in with a verdict. It has the additional advantage that in the event one of the working jurors for some reason is unable to continue serving, continue deliberating, then we draw one of the alternate jurors and have that alternate juror sit in for the juror that is unable to continue serving. If we didn't have that and we had an alternate juror go in to replace a juror, the jury has to go back to square one and start all over again, and this involves a considerable amount of time and considerable inconvenience for everybody.

"So that the four jurors that are called and named as alternate jurors will be in the jury room with you, Mr. Foreman and ladies and gentlemen, but, Mr. Foreman, I instruct you very stiffly and severely that they are not to be permitted to enter into any of the discussions. They can listen; they can observe, but they can't talk. Do you understand?"

Allowing alternate jurors into the jury room during deliberations is proscribed by rule 20 (d) (2), which states that, upon submission of the case to the jury, alternate jurors "shall be kept separate and apart from the other jurors in some convenient place." The deliberations of the regular jurors are of no concern to the alternates; if it becomes necessary to substitute an alternate for a regular juror during deliberations, deliberations must begin anew. *Commonwealth* v. *Haywood*, 377 Mass. 755, 770 (1979). Furthermore, unlike Mass. R. Crim. P. 19, 378 Mass. 888 (1979), which allows a defendant to waive either his right to a trial by jury or his right to a twelve-person jury in the Superior Court, rule 20 (d) (2) has no waiver provision. There can be no doubt that, despite his good intentions, the judge

·

erred by allowing the alternates to attend the jury deliberations. The question is whether there should be a remedy, and, if so, what the remedy should be, in light of the values sought to be protected by rule 20 (d) (2) and in light of the judge's jury instructions concerning nonparticipation by the alternates and counsel's agreement to the procedure.

The Commonwealth argues that defense counsel's agreement to the procedure prevents the defendant from asserting that it was reversible error. The Commonwealth relies on several cases concerned with procedural irregularities involving juries, where we have either held that the defendant could not complain on appeal where his counsel acquiesced or failed to object below, or held that there was no substantial risk of a miscarriage of justice. See, e.g., *Commonwealth* v. *Barrows*, 391 Mass. 781, 783-784 (1984); *Commonwealth* v. *MacDonald (No. 1)*, 368 Mass. 395, 397-400 (1975); *Commonwealth* v. *Zakas*, 358 Mass. 265, 267-268 (1970); *Amado* v. *Commonwealth*, 349 Mass. 716, 717-719, 722 (1965). However, there is no inflexible rule, applicable in all instances, that defense counsel's agreement to a procedure involving the jury, or failure to object to it, operates as a waiver or otherwise prevents the defendant from asserting on appeal that the procedure constituted reversible error. For instance, by statute and rule a defendant's right to a jury trial can be waived only by the defendant's personal execution of a written waiver, G. L. c. 263, § 6 (1986 ed.), Mass. R. Crim. P. 19 (a), *Gallo* v. *Commonwealth*, 343 Mass. 397, 402 (1961), and even then, by declaration of this court, such a waiver is ineffective in the absence of an appropriate colloquy between the judge and the defendant. *Ciummei* v. *Commonwealth*, 378 Mass. 504, 506-511 (1979). These exceptions to the general rule that a defendant is bound by his or her counsel's agreements reflect the extraordinary value we place on the right of trial by jury. Proper respect for the right to jury trial also dictates judicial vigilance to ensure, in so far as reasonably possible, that jury deliberations are conducted privately and without extraneous influence. See *Commonwealth* v. *Fidler*, 377 Mass. 192, 196 (1979); *Woodward* v. *Leavitt*, 107 Mass. 453, 460 (1871).

The critical fact to be recognized in this case is that "alternate jurors," as long as they remain alternates, really are not jurors. When they attend jury deliberations they do so as mere strangers. *State* v. *Cuzick*, 85 Wash. 2d 146 (1975), like this case, involved the presence without objection of a nonparticipating alternate juror during the jury's deliberations. In affirming a decision of the Court of Appeals reversing the defendant's convictions, the Supreme Court of Washington reasoned as follows: "However many persons comprise a jury, there can be no question that it must reach its decision in private, free from outside influence. This principle is of constitutional stature. . . . No one contends that the alternate juror fully participated in the jury's discussions; we assume he followed, at least substantially, the court's instructions not to do so. He was, then, essentially an outsider watching the other members of the panel reach their decision. His presence as one not obligated to express an opinion, not committed to the decision ultimately reached, not faced with the awful responsibility to decide, could not have gone unnoticed by the 12 formally empaneled jurors and may well have affected their willingness to speak and act freely. Such observation, even by one sworn to secrecy and silence, violates the cardinal requirement that juries must deliberate in private . . ." (citations omitted). *Id.* at 149. For a similar holding and rationale see *United States* v. *Virginia Erection Corp.*, 335 F.2d 868, 872 (4th Cir. 1964). See also *United States* v. *Allison*, 481 F.2d 468, 472 (5th Cir.), aff'd after remand, 487 F.2d 339 (5th Cir. 1973), cert. denied, 416 U.S. 982 (1974), in which the court concluded that an alternate juror's attendance at jury deliberations, even though the juror had been instructed not to participate, was reviewable on appeal in spite of counsel's agreement to the procedure.

The Commonwealth directs our attention to *People* v. *Valles*, 24 Cal. 3d 121 (1979), in which the Supreme Court of California affirmed a defendant's conviction, holding that the defendant could not complain on appeal of the presence of an alternate juror in the deliberating room when his counsel stipulated to that procedure. We make two observations. First, the court expressly distinguished the case before it from cases in other

States with statutes like Mass. R. Crim. P. 20 (d) (2), which provide that alternate jurors are not to be present in the jury room during deliberations. *Id.* at 126. Second, we find the dissenting opinion in *People* v. *Valles,* 24 Cal. 3d 121, 130 (1979), more persuasive than the opinion of the court. The dissenters reasoned: "[A] fair jury trial can be achieved only if the jury is insulated from outside communications or influences. . . . Such communications, even if subtle or unintended, are nonetheless an adulteration of the pristine character of the jury function. It would be understandably difficult for an alternate to remain locked up with regular jurors, perhaps for days, without at some time, during heated discussions, reflecting agreement or disagreement, support or opposition, encouragement or disapproval, praise or derision, hope or frustration, or any of countless other emotions. Even if only one regular juror observed such a response on the part of the alternate — not necessarily from his speech, but from his gestures, attitude, or facial expressions — it could well have a tilting effect on the ensuing vote." (Citations omitted.) *Id.* at 131 (Mosk, J., dissenting, with whom Bird, C.J., concurred). We conclude that, in view of the vital importance of the right to trial by a jury that is free from outside influence, and the potential for interference with that right, a defendant is not barred from contending on appeal that the presence of alternate jurors in the jury room during deliberations was reversible error even though defense counsel had agreed to that procedure. We leave to another day the question whether an informed defendant who has personally agreed on the record to such a procedure may waive his right to raise such an issue on appeal, or be estopped from doing so.

Our conclusion that the procedure relative to the alternate jurors may be challenged on appeal does not end our inquiry. The Commonwealth contends that, at most, the defendant is entitled to a remand for an evidentiary hearing to determine whether he was prejudiced by the procedure. The leading case providing for such a hearing is *United States* v. *Allison, supra* at 472. The court, *id.* at 472, reasoned that "if the alternate in fact abided by the court's instructions to remain orally silent

and not to otherwise indicate his views or attitude — in writing, by facial expressions, gestures, or the like — and if the presence of the alternate did not operate as a restraint upon the regular jurors' freedom of expression and action, we see little substantive difference between the presence of a mute (orally and otherwise) alternate during jury deliberations and the presence in the juryroom of an unexamined book which had not been admitted into evidence. . . . On the other hand, sufficient prejudice and effect on the jury's verdict would be shown and, therefore, a new trial required if the alternate disobeyed the court's instructions and in any way participated in the jury deliberations, or if any regular juror was deterred in the free exercise of his independence of thought, expression, or action by the mere presence of a non-participating alternate during deliberations." (Citations omitted.) Accord *United States* v. *Watson*, 669 F.2d 1374, 1391-1392 (11th Cir. 1982).

We decline to follow *United States* v. *Allison, supra,* with respect to requiring an evidentiary hearing to determine prejudice. Instead, we adopt the reasoning of the Supreme Court of Washington in *State* v. *Cuzick, supra* at 150: "A factual hearing would not be likely to shed much light on the actual effect of the alternate juror's presence in the jury room. It would certainly be impossible to recreate at this point every move, every expression he might have made during the several hours of deliberations. Even if it were determined exactly what he did or said, it would be difficult to tell how or whether his actions affected the other jurors. The outcome of such an investigation would be further doubt; its primary effect would be to further invade the jury room and impose on those who served in it." Accord *United States* v. *Chatman*, 584 F.2d 1358, 1361 (4th Cir. 1978); *United States* v. *Beasley*, 464 F.2d 468, 469-470 (10th Cir. 1972), aff'd after remand, 485 F.2d 60 (10th Cir. 1973), cert. denied, 416 U.S. 941 (1974); *United States* v. *Virginia Erection Corp., supra*; *State* v. *Bindyke*, 288 N.C. 608, 623-624 (1975). Surely, it cannot rightly be said that the "body language" or even the mere presence of one or more of the four alternates present at the jury's deliberations in this case could not reasonably have influenced one of the jurors,

and any inquiry into whether any juror was actually influenced would violate the principle expressed in *Commonwealth* v. *Fidler, supra* at 198-199, that inquiry into the subjective mental process of jurors is impermissible. We continue to adhere to that principle, and thus we decline to remand this case for an evidentiary hearing relative to prejudice. The defendant is entitled to a new trial.[1]

We briefly address the other two issues raised by the defendant, since they could recur at a future trial. The defendant argues that the judge committed error in denying his motion in limine to preclude impeachment by prior convictions of offenses (armed robbery) similar to the crimes for which he was being tried. The record of convictions showed four convictions in 1967, one of which was for attempted breaking and entering, one was for possession of burglarious tools, and two were for breaking and entering in the nighttime and larceny. The record also showed a conviction in 1979 for fraudulently obtaining a controlled substance, and three armed robbery convictions in 1980. A prior armed robbery conviction is an "in-

---

[1] The rule adopted today applies in cases that are pending on direct appeal or as to which the time for direct appeal has not expired on the date of this decision. Our decision does not provide a basis for collateral attack on final judgments. This is in accord with our analysis in *Commonwealth* v. *Breese*, 389 Mass. 540 (1983).

The fact that our decision relates to a matter of first impression in this Commonwealth triggers an inquiry into whether it should be applied prospectively only. *Id.* at 541-542. The most important consideration is whether the rule "go[es] to the heart of the fact-finding process." *Id.* at 549. "[T]he extent to which a practice infects the integrity of the truth-determining process of trial 'is necessarily a matter of degree.' " *Id.* (citations omitted). Although the rule we announce today is designed to enhance the fairness of jury trials by eliminating a possible source of outside influence on jurors, the rule does not go to the heart of the fact finding process to the degree that rules requiring retroactive application do. See *Ivan V.* v. *City of New York*, 407 U.S. 203 (1972) (reasonable doubt standard of proof in criminal cases); *Jackson* v. *Denno*, 378 U.S. 368 (1964) (the right of an accused to exclude an involuntary confession from trial); *Gideon* v. *Wainwright*, 372 U.S. 335 (1963) (an indigent's right to the advice of counsel at trial). We conclude therefore that retroactive application of today's decision is not required. Furthermore, in view of the adverse impact retroactive application would be likely to have on the administration of justice, we conclude that it would be inappropriate. *Breese, supra* at 548-550.

dicator of substantial weight" regarding credibility, *Commonwealth* v. *Ruiz*, 22 Mass. App. Ct. 297, 303 (1986), *S.C.*, 400 Mass. 214 (1987). Furthermore, the defendant was not charged with armed robbery in this case. In *Commonwealth* v. *Walker*, 401 Mass. 338, 345-346 (1987), we said that the trial judge did not abuse his discretion in allowing impeachment of the defendant with a prior unarmed robbery conviction when he was on trial for armed robbery as well as for other crimes. In that case, a prior larceny conviction was also available for use, and was in fact used, for impeachment purposes. We conclude that the judge in the present case acted within his discretion in denying the defendant's motion in limine. Of course, the judge at retrial will be free to exercise his or her discretion differently.

Lastly, there was no error in the admission of certain testimony on redirect examination concerning the giving by the defendant of blood, saliva, hair, and handwriting samples. On direct examination, Sergeant Jeremiah J. Manfra, a Commonwealth witness, testified that he observed the taking of hair, blood, saliva, and handwriting samples from the defendant on May 7, 1985. On cross-examination, defense counsel elicited the fact that the samples were given "promptly," "politely," "[w]ithout hesitation," and with "[f]ull cooperation." On redirect examination, the witness was allowed to testify, over defense counsel's objection, that the samples were not given "voluntarily," but rather under the compulsion of a court order.

The defendant claims that admitting the evidence of the court order on redirect examination was prejudicial error because it was an attempt to have the jury draw an adverse inference from the legitimate exercise of the defendant's good faith attempt to test his constitutional rights through the legal process. However, it was defense counsel, and not the prosecutor, who first raised the manner and circumstances under which the defendant gave the samples, in an apparent attempt to have the jury draw an inference of innocence. " 'The purpose of redirect examination is to explain or rebut adverse testimony or inferences developed during cross-examination. . . . The subject matter . . . was opened up in cross-examination, and

therefore an exploration . . . on redirect was clearly within' the judge's discretion. (Citation omitted.)" *Commonwealth* v. *Reed*, 397 Mass. 440, 444-445 n.6 (1986), quoting *Commonwealth* v. *Hoffer*, 375 Mass. 369, 375 (1978).

The judgments are reversed, the verdicts are set aside, and the case is remanded for a new trial.

*So ordered.*

ABRAMS, J. (concurring). I agree with the result because any other result, in my view, would adversely affect jury service and would be inconsistent with *Commonwealth* v. *Fidler*, 377 Mass. 192, 198 (1979). As the Commonwealth recognizes in its brief, there would have to be a hearing to determine whether the jurors were in some way affected by the presence of unauthorized persons in the jury room at the time of its deliberations. See *id.* at 196. Such a hearing would require evidence concerning the effect on jurors of the unauthorized presence of persons in the jury room during deliberations. Essentially, the evidentiary issue concerns the subjective mental process of the jurors, an inquiry forbidden by *Fidler*. *Id.* at 198. Under *Fidler*, jurors may not testify as to what happened in the jury room during deliberations, only as to extraneous matters in the jury room. In this case, it is clear that there were unauthorized persons in the jury room.

Further, for the jury system to function properly, jurors must be free from unwarranted harassment, and the jurors must not be inhibited in the give and take of their discussions. Regular use of postverdict hearings may stifle juror debate and jurors may be intimidated into reaching a popular result rather than risk posttrial examination regarding the reasons for their verdict. For these reasons, a hearing as to the effect the unauthorized persons had on the regular jurors is inappropriate. *Fidler*, *supra* at 196-198.

Last, the hearing itself is a significant governmental intrusion into the privacy of the jury deliberative process. Protection of the privacy of the deliberative process is a fundamental concern

because "[c]ommunity participation in the administration of the criminal law . . . is not only consistent with our democratic heritage but is also critical to public confidence in the fairness of the criminal justice system." *Taylor* v. *Louisiana*, 419 U.S. 522, 530 (1975). For these reasons I concur.


NOLAN, J. (dissenting). This result represents a quintessential example of the triumph of form over substance. The substance of this case is that the jury heard the evidence and decided that, beyond a reasonable doubt, the defendant was guilty of serious crimes. The form was the violation (conceded) of the rule to which the defendant never objected, although he had ample opportunity.

The judge warned the alternate jurors not to participate or to say anything. There is no indication that they violated these instructions. There is not the faintest suggestion in the record that they participated in or even spoke during the deliberations.

At most, the court today should urge trial judges to comply with the rule. To do more in this case is to interfere with the orderly criminal justice process.

I dissent.