BRIAN FITZPATRICK & others[1] *vs.* JOEL W. ALLEN & others.[2]

Middlesex. March 6, 1991. - August 6, 1991.

Present: LIACOS, C.J., WILKINS, ABRAMS, NOLAN, LYNCH, O'CONNOR, & GREANEY, JJ.

*Jury and Jurors. Evidence,* Relating to deliberation by jurors. *Practice, Civil,* Conduct of juror, New trial.

In a civil action, once the party moving for a new trial demonstrates that the jury were exposed to an extraneous influence, the burden shifts to the nonmoving party to show that no reasonable likelihood exists that the extraneous matter would have affected the verdict of a hypothetical average jury [794-796]; however, in circumstances where the jurors at the trial of a medical malpractice case attempted to resolve key issues by consulting a medical reference book not in evidence, they could not fairly be considered a hypothetical average jury for the purpose of assessing possible prejudice, and a new trial was required [796]. ABRAMS, J., concurring. WILKINS, J., dissenting.

CIVIL ACTION commenced in the Superior Court Department on December 23, 1983.

The case was tried before *Robert J. Hallisey*, J., and a motion for a new trial was heard by him.

The Supreme Judicial Court granted a request for direct appellate review.

*Andrew C. Meyer, Jr.* (*Elizabeth N. Mulvey*) with him for the plaintiffs.

*Timothy P. O'Neill* (*Marcia K. Divoll* with him) for Joel W. Allen.

*Frank E. Reardon* (*Kimberly L. Nelson* with him) for Stephen J. Sandler.

---

[1]John and Debra Fitzpatrick, parents of the minor plaintiff.
[2]Stephen J. Sandler, and Stephen J. Sandler, M.D., P.C.

LIACOS, C.J. We are asked in this case to decide what standard should be applied by a judge when ruling on a motion for a new trial in a civil case where an extraneous "disturbing influence" has been present during jury deliberations. We have recently considered this issue in *Markee* v. *Biasetti, ante* 785 (1991).

This medical malpractice case was tried to a jury for about two weeks. There was evidence of the following facts. On May 21, 1982, Debra Fitzpatrick, anticipating the birth of her son, Brian, was admitted to Mount Auburn Hospital for treatment of pregnancy-induced hypertension. Mrs. Fitzpatrick was under the care of the defendant Dr. Stephen J. Sandler. During the following week, Dr. Sandler medicated Mrs. Fitzpatrick with 300 milligrams of phenobarbital daily and attempted three times to induce Mrs. Fitzpatrick's labor and delivery of Brian. On Friday morning, May 28, 1982, Mrs. Fitzpatrick began experiencing contractions. Dr. Sandler departed for the Memorial Day holiday weekend, leaving his patient in the care of the defendant Dr. Joel W. Allen. Dr. Allen claimed that Dr. Sandler never informed him of the presence of Mrs. Fitzpatrick in the hospital. Dr. Allen also claimed that he was unaware of Mrs. Fitzpatrick and her condition until 7 o'clock Friday evening. After briefly checking on Mrs. Fitzpatrick at 7 P.M., Dr. Allen left the hospital on a personal errand. Nurses attempted unsuccessfully to contact him by way of a paging device at 8:30 P.M. At 9:30 P.M., when Dr. Allen was finally reached, he returned to the hospital. Mrs. Fitzpatrick had already been transferred to the labor and delivery area of the hospital and had been treated for apparent infant distress detected by a fetal heart monitor. Dr. Allen requested an epidural for Mrs. Fitzpatrick, but an anesthesiologist refused to administer one. Dr. Allen then administered morphine to Mrs. Fitzpatrick intravenously to ease her labor pain. She subsequently gave birth to Brian. Forty minutes after his birth, Brian stopped breathing. Efforts to resuscitate him eventually succeeded. Brian was later diagnosed as having cerebral palsy. John and Debra Fitzpatrick initiated this malpractice suit against the

defendants, alleging that they were negligent in their care of Mrs. Fitzpatrick and that their negligence was the proximate cause of Brian's cerebral palsy.

Five experts testified, three on behalf of the plaintiffs and two for the defendants. The experts opined that the child's cerebral palsy was the result of inadequate oxygen supply to his brain around the time of birth. The experts disagreed as to the cause of the apneic event. In response to special questions, the jury found the defendants negligent, but determined that the defendants were not the proximate cause of Brian Fitzpatrick's cerebral palsy.

Soon after the jury returned their verdict, a juror (juror X) called the plaintiffs' attorney. Juror X alleged, inter alia, that some of the jurors had consulted a home reference medical book brought into the deliberation room by one of the jurors. Juror X signed an affidavit supporting his allegations. The plaintiffs' attorney delivered the affidavit to the trial judge, requested a hearing on the matter, and submitted a motion for a new trial. The judge ordered a hearing and reconvened the jurors for questioning.

At the posttrial hearing it was revealed that a juror did in fact bring a home reference medical book into the jury room on the last day of deliberations. It was further revealed that six jurors either read from the book or heard others read from it. Specifically, each of the six jurors reported that he or she read, or heard read, a section of text regarding cerebral palsy. One juror stated: "The part I remember, there was no known cause for [cerebral palsy]." The reference work, The American Medical Association Family Medical Guide (Random House 1987), contained over 785 pages and included a broad range of medical topics including childbirth, major health disorders, and a drug index. Regarding the cause of cerebral palsy, the book states: "For most children, the cause of cerebral palsy cannot be determined. It is definitely not inherited, and having one affected child does not increase the likelihood of having another. Cerebral palsy may result from abnormal development of the brain or from

brain damage that occurred before, during, or shortly after birth." *Id.* at 684.

The judge conceded, in his memorandum of decision, that the most troubling aspect of the event was that the book "says the causes of cerebral palsy are unexplained in 'most' cases." Relying on *Commonwealth* v. *Fidler*, 377 Mass. 192, 201 (1979), however, the judge proceeded to "assess the probable effect of such extraneous evidence on a hypothetical average jury." He determined that the critical issue was the cause of the child's apneic event resulting in cerebral palsy, not the cause of cerebral palsy itself, on which point the experts at the trial agreed.

The judge concluded: "In light of the fact that few jurors actually read or heard the material, that the material was general and not case specific, and that agreement of only 10 of 12 is required (so that more than two would have had to be determinatively influenced by this one point to make a difference), I am not persuaded that, on balance, a reasonable jury might have come to a different result without [the extraneous material]."[3]

The plaintiffs contend that the judge applied an incorrect legal standard to determine whether the motion for a new trial should have been granted. Relying on *Commonwealth* v. *Fidler, supra*, the plaintiffs argue that, once the party seeking a new trial demonstrates that the jury were exposed to extraneous matters, the burden shifts to the nonmoving party to show that there was no prejudice. Otherwise, they argue, prejudice is presumed and a motion for a new trial must be granted. To the extent the plaintiffs' argument suggests that there is no justifiable basis for distinguishing between criminal and civil jury trials regarding the shifting burden, we agree. We believe there should be a similar commitment to fairness in a civil trial. See *Markee* v. *Biasetti, supra* at 788-789; *Commonwealth* v. *Smith*, 403 Mass. 489, 495 (1988).

---

[3]The motion for a new trial was denied. The plaintiffs appealed. We granted the applications of the plaintiffs and the defendants for direct appellate review. We reverse and remand the matter for a new trial.

Accord *Hasson* v. *Ford Motor Co.*, 32 Cal. 3d 388, 416-417
(1982) (shifting burden to nonmoving party to show lack of
prejudice); *Lopez* v. *Sears Roebuck & Co.*, 70 Haw. 562,
564 (1989) (same, in context of unauthorized view); *Heaver*
v. *Ward*, 68 Ill. App. 3d 236, 242 (1979) (shifting burden to
nonmoving party); *Daniels* v. *Barker*, 89 N.H. 416, 420-421
(1938) (prejudice presumed); *Sanders* v. *Curry County*, 253
Or. 578, 580 (1969) (same, in context of unauthorized view).
See also *Barnhart* v. *International Harvester Co.*, 441 P.2d
1000, 1005 (Okla. 1968) ("Any misconduct which might in-
fluence the jury is sufficient to require setting aside of that
verdict as a matter of safety").[4]

Once it is determined that the jury have been exposed to
extraneous matter, the burden shifts to the nonmoving party
to show that there was no reasonable likelihood that the jury
were influenced by the extraneous matter. *Markee* v.
*Biasetti, supra* at 788-789. The degree of proof placed on the
Commonwealth in *Fidler* to show beyond a reasonable doubt
that no prejudice resulted is consistent with the standard of
proof generally in criminal trials. In civil matters, however, a
lesser standard of "no reasonable likelihood of prejudice" is
more appropriate.

We reach this conclusion because inquiry into jury deliber-
ations is necessarily limited to juror testimony regarding the
existence of an improper influence. *Commonwealth* v. *Fidler*,
*supra* at 196, citing *Woodward* v. *Leavitt*, 107 Mass. 453,
466 (1871). Juror testimony is not permitted regarding the
degree of influence the extraneous matter had on the juror's
mind. *Woodward* v. *Leavitt, supra.* This necessary limitation

---

[4]Some jurisdictions place the burden on the moving party to demon-
strate prejudice, but vary as to the degree of proof necessary. See *Kirby* v.
*Rosell*, 133 Ariz. 42, 45 (Ct. App. 1982) (moving party must demonstrate
reasonable possibility of prejudice); *Ravin* v. *Gambrell*, 788 P.2d 817, 821
(Colo. 1990) (reasonable possibility of prejudice); *Meirick* v. *Weinmeister*,
461 N.W.2d 348, 350 (Iowa Ct. App. 1990) (juror comments regarding
extraneous information must be designed to, and with reasonable
probability, influence jury verdict); *Maryland Deposit Ins. Fund Corp.* v.
*Billman*, 321 Md. 3, 17 (1990) (moving party must demonstrate a
probability of prejudice).

prevents a judge reviewing the matter from determining the *actual* effect extraneous material had on a jury's deliberations.

There can be no inquiry concerning the actual impact of extraneous matter on the jury. *Commonwealth* v. *Fidler*, 377 Mass. 192, 201 (1979). *Woodward* v. *Leavitt*, 107 Mass. 453, 466 (1871). Yet, the question whether the extraneous matter may have been prejudicial to the party moving for a new trial is critical to determining whether the new trial should be granted. As an accommodation to both concerns, we held in *Fidler* that the appropriate test would be whether the extraneous matter might have affected the verdict of a hypothetical average jury. Then, in *Markee* v. *Biasetti*, *supra*, we concluded that, because of the substantial involvement of some of the jurors in conducting their own extra-evidence investigation, the jury could not fairly be assumed to be a hypothetical average jury and that, therefore, a judge could not legitimately make a determination that there was no likelihood that the jury were influenced by the extraneous matter. We rejected the hypothetical average jury test in the circumstances of that case and concluded that, the extraneous matter having been established, a right to a new trial necessarily followed. We think that there is no meaningful difference between jurors investigating an accident scene, as in *Markee*, and jurors consulting a medical reference work not in evidence as occurred in this case. In both cases, unlike in *Fidler*, there was active juror participation in an effort to resolve key issues by resort to material not in evidence. Thus, we conclude, as we did in *Markee*, the plaintiff is entitled to a new trial as matter of law.

We vacate the order denying the motion for a new trial. The verdict in favor of the defendants is set aside, and we remand the case for a new trial.

*So ordered.*

ABRAMS, J. (concurring). In *Markee v. Biasetti, ante* 785 (1991), I concurred with Justice Wilkins favoring a rule which required that a party moving for a new trial based on evidence that the jury were exposed to extraneous material make some showing that he was prejudiced by the jury misconduct. The jurisdictions are split: some courts place the burden on the nonmoving party to show that there was no reasonable likelihood that the jury were influenced by exposure to extraneous material, but more courts require that the moving party show that he was prejudiced by the extraneous material before the jury. See cases cited, *ante* 795 n.4; *Borden v. St. Louis Southwestern Ry.*, 287 Ark. 316, 320 (1985); *Williams v. Salamone*, 192 Conn. 116, 120 (1984); *Meirick v. Weinmeister*, 461 N.W.2d 348, 350 (Iowa Ct. App. 1990); *Maslinski v. Brunswick Hosp. Center, Inc.*, 118 A.D.2d 834, 835 (N.Y. 1986); *Kansas City S. Ry. v. Chaffin*, 658 S.W.2d 186, 189 (Tex. Ct. App. 1983); cert. denied, 469 U.S. 854 (1984); *Richard S. v. Overlake Hosp. Medical Center*, 59 Wash. App. 266, 271 (1990); *Zanetti Bus Lines, Inc. v. Logan*, 400 P.2d 482, 488 (Wyo. 1965); Annot., 31 A.L.R.4th 623 (1984). I reaffirm my preference for the latter approach. Such a rule is consistent with other rules governing the grant of a new trial because of trial error in a civil matter. See *Markee*, supra at 789-790 (Wilkins, J., concurring). However, in *Markee, supra*, the court chose to place the burden on the nonmoving party to demonstrate that there was no reasonable likelihood that the jury were influenced by the extraneous material. I accept, as I must, the court's choice of rule. Therefore, I concur in the result.[1]

WILKINS, J. (dissenting). In *Markee v. Biasetti, ante* 785 (1991), I concurred in the court's conclusion that a new trial should be ordered, concluding that the extraneous informa-

---

[1]In light of the court's ruling, it is particularly important that trial judges caution the jury at the outset of a trial as to what materials they may consider in their deliberations.

tion gathered by certain jurors at the site of an accident prejudiced the losing party "in the sense that the jury might reasonably have reached a different result" if that information had not been before the jury. *Ante* at 790 (Wilkins, J., concurring). This case does not involve jurors conducting on-site investigations with an immeasurable impact on the verdict of a reasonable jury but rather it involves the presence of a home reference medical book in the jury room. Here the extraneous information is precisely known and its likely effect fully assessable.

The trial judge concluded that, if certain jurors had not read or heard the statement that the cause of cerebral palsy is unexplained in most cases, it is not likely that a reasonable jury would have come to a different verdict. The issue here was not what caused the infant's cerebral palsy but rather whether the apneic event that all agreed caused the cerebral palsy was caused by the negligence of either or both of the defendant physicians. The medical book said nothing on this crucial topic.

The court says that active juror participation in an effort to resolve key issues by resort to material not in evidence, here as in the *Markee* case, is reversible error as a matter of law. I reject a rule calling for automatic reversal and favor an assessment of the extraneous material not in evidence to determine whether its presence was likely to have been prejudicial, even if one accepts the court's view that the defendants must demonstrate the absence of prejudice. Normally such an assessment is the function of the trial judge in the first instance. Because the trial judge has retired, this court should have undertaken that function.

I conclude, in agreement with the experienced trial judge who heard the witnesses, that the plaintiffs have not met the burden of showing that, if the medical book had not been in the jury room, the jury might reasonably have reached a different result.[1] I also conclude that, if the defendants must

---

[1]"Where, as here, the precise extraneous matter is known but direct evidence as to its effect on the deliberations is not permitted, a sound balance

show an absence of prejudice (the standard the court says should be applied), they have done so.[2]

---

is struck by a rule which looks to the probability of prejudice from the face of the extraneous matter in relation to the circumstances of the particular case. It is the function of the trial judge when ruling on a motion for a new trial to evaluate the degree of probable prejudice and whether it justifies a new trial. That judgment will not be disturbed but for an abuse of discretion." *Wernsing* v. *General Motors Corp.*, 298 Md. 406, 419-420 (1984).

[2]See *United States* v. *Weiss*, 752 F.2d 777, 782-783 (2d Cir. 1985) (presumptive prejudice of extra-record information [here excerpt from textbook] may be rebutted by affirmative showing that information was harmless. "The court may properly conclude that such extra-record information was non-prejudicial if it determines that an abundance of properly admitted evidence relevant to this matter exists." *Id.* at 783. In this case, everyone agreed on the cause of the infant's cerebral palsy.)